## COUNT II
### CONSTRUCTIVE TRUST

6.08    Plaintiffs are entitled to distribution of funds wrongfully held by one or more of the Defendants.

6.09    Plaintiffs are entitled to money in the possession of one or more Defendants and as belonging to Plaintiffs where that money is clearly traceable to particular funds or properly in one or more of the Defendants' possession, which funds arose from Plaintiffs' payments.

6.10    Plaintiffs are, therefore, entitled to an order barring Defendants from disbursing the disputed funds and requiring Defendants to hold those funds in trust for Plaintiffs' benefit.

## COUNT III
### FRAUDULENT CONCEALMENT

6.11    Wicker and Ridge, Bevan, Cocks, Bevan and Innovus acting for themselves, Republic, SecurePlan and American General, and the Millennium Defendants, fraudulently and intentionally concealed material facts from the Plaintiffs for the purpose of inducing the Plaintiffs to invest in the ADVANTAGE DBO PLANT, Millennium Plan and the American General policies pursuant to the Defendants' deceptive insurance marketing scheme. Said concealment by the Defendants was calculated, willful and intentional and renders Wicker, Ridge, Bevan, Cocks, and Innovus, American General and the Millennium Defendants liable to the Plaintiffs for actual and punitive damages as though said Defendants had affirmatively stated the non-existence of the matters said Defendants concealed. The acts of said Defendants as aforesaid render said Defendants liable to the Plaintiffs and causes of action are hereby stated for fraudulent concealment.

## COUNT IV
### CIVIL CONSPIRACY

6.12    The acts of Wicker, Ridge, Bevan, Innovus, Cocks, Republic and SecurePlan, American General and the Millennium Defendants, as aforesaid, constitute a civil conspiracy giving rise to a cause of action for civil conspiracy which cause of action is hereby stated as to each of the Defendants.  The Millennium Defendants, Bevan, Innovus, Cocks, Republic and SecurePlan have conspired to defraud Plaintiffs and convert Plaintiffs' funds.

## COUNT V
### ARTICLE 541.151, TEXAS INSURANCE CODE
### DECEPTIVE TRADE PRACTICES

6.13    The actions of Wicker, Ridge, Bevan and Innovus, SecurePlan individually and on behalf of American General and the Millennium Defendants as alleged above are in violation of statutory sections of the Texas Insurance Code thereby giving rise to a claim under Article 541.151 Tex. Ins. Code and the Deceptive Trade Practices Act ("DTPA").  Said violations are a producing cause of Plaintiffs' damages.  Specifically, said Defendants' misrepresentations violate the Texas Insurance Code and DTPA in the following respects:

(a)    Said Defendants misrepresented the terms, benefits or advantages of the insurance in violation of Texas Insurance Code Article 541.051.

(b)    Said Defendants made, or directly or indirectly caused to be made, an assertion, representation or statement with respect to insurance that was untrue, deceptive or misleading in violation of Texas Insurance Code Article 541.052.

(c)    Said Defendants misrepresented a material fact in violation of Texas Insurance Code Article 541.061.

(d)    Said Defendants failed to state a material fact necessary to make other statements not misleading, considering the circumstances under which the statements were made in violation of Texas Insurance Code Article 541.061.

(e)     Said Defendants made misrepresentations in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact in violation of Texas Insurance Code Article 541.061.

(f)     Said Defendants caused confusion as to the source, sponsorship, approval or certification of the investment in violation of DTPA §17.46(b)(2).

(g)     Said Defendants represented that the investment and their services had sponsorship, approval, characteristics, uses and benefits which they did not have in violation of DTPA §17.46(b)(5).

(h)     Said Defendants represented that the investment and their services were of a particular standard, quality or grade when they were not in violation of DTPA §17.50(b)(7).

(I)     Said Defendants failed to disclose information regarding the investment and their services which was known at the time with the intent of inducing Plaintiffs into a transaction in which they would not have entered had the information been disclosed in violation of DTPA §17.50(b)(24).

6.14    Plaintiffs further sue for trebling of these damages and allege that said Defendants' misrepresentations as described herein were committed "knowingly," in that said Defendants had actual awareness, at the time of the acts complained of, of the falsity, deception or unfairness of the conduct in question, thereby entitling the jury to award Plaintiffs three times their economic damages as additional damages under Article 541.152 of the Texas Insurance Code and DTPA §17.50, for which Plaintiffs sue.

6.15    Plaintiffs sue for reasonable and necessary attorneys' fees for the preparation and trial of this cause and any appeal therefrom pursuant to Article 541.152 of the Texas Insurance Code and DTPA §17.50(d), taking into consideration all relevant factors.

## VII.
## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

The allegations of Paragraphs I through VI above are repeated and incorporated in this Paragraph as though fully copied herein.

7.01    Plaintiffs hereby affirmatively plead the discovery rule and would show that Plaintiffs' claims are not barred by limitations and accrued only when Plaintiffs discovered or, in the exercise of reasonable diligence, should have discovered the facts giving rise to their causes of action.

7.02    Plaintiffs hereby affirmatively plead fraudulent concealment and would show that Plaintiffs claims are not barred by limitations and accrued only when Plaintiffs discovered the Defendants' fraudulent concealment of the facts giving rise to Plaintiffs' causes of actions.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award the following to Plaintiffs:

1.    Order the rescission of the Plaintiffs' investment, including the return of all moneys paid by Plaintiffs for the life insurance policies issued by American General, plus statutory prejudgment interest, or such other amount as may be proven at trial;

2.    Enjoin Defendants from disbursing the disputed funds pending further orders of this Court, and order Defendants to pay such funds over to Plaintiffs, plus statutory prejudgment interest, or such other amounts as may be proven at trial;

3.    Award Plaintiffs their actual damages as alleged;

4.    Award Plaintiffs their taxable costs, expenses and reasonable attorneys' fees;

5.    Award Plaintiffs treble damages under the Texas Insurance Code and DTPA, and punitive damages in the highest amount allowed by law; and

6.    Award Plaintiffs such other relief as may be just and equitable in the circumstances.

Respectfully submitted,

By:   *Anthony L. Vitullo*

Anthony L. Vitullo
State Bar No. 20595500
FEE, SMITH, SHARP & VITULLO, LLP
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
Telephone:   (972) 934-9100
Fax:        (972) 934-9200
lvitullo@feesmith.com

-and-

John L. Malesovas
State Bar No. 12857300
P. O. Box 1709
Waco, Texas 76703-1709
Telephone:   (254) 753-1777
Fax:        (254) 755-6400
john@malesovas.com
**Attorneys for Plaintiffs**

QC-084870

CAUSE NO. CV08-0208

| | | |
|---|---|---|
| FRED WESTFALL, TIMOTHY WESTFALL, PATRICIA WESTFALL GONZALES, AND WESTFALL CONSTRUCTORS, LTD., | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § § | |
| v. | § § | |
| NORMAN H. BEVAN, JONATHAN COCKS, RAYMOND WICKER, SCOTT RIDGE, AMERICAN GENERAL LIFE INSURANCE COMPANIES , THE MILLENNIUM MULTIPLE EMPLOYER WELFARE BENEFIT PLAN, MILLENIUM MARKETING GROUP, LLC, AND INNOVUS FINANCIAL SOLUTIONS, INC., | § § § § § § § § § § § | DALLAS COUNTY, TEXAS |
| Defendants. | § | 95th JUDICIAL DISTRICT |

### DEFENDANT RAYMOND WICKER'S ORIGINAL ANSWER, COUNTERCLAIM AND THIRD PARTY PETITION

COMES NOW Defendant Raymond Wicker ("Wicker" or "Defendant") and files this, his

Original Answer, Counterclaim and Third Party Petition, and would respectfully show the Court

as follows:

### GENERAL DENIAL

1.      Defendant generally denies, pursuant to Texas Rule of Civil Procedure 92, each

and every, all and singular, the allegations contained in Plaintiffs' Original Petition and demands

strict proof thereof by a preponderance of the evidence.

**EXHIBIT
A-8**

**DEFENDANT RAYMOND WICKER'S ORIGINAL ANSWER, COUNTERCLAIM AND THIRD PARTY PETITION – Page 1**

2.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' claims are subject to complete preemption pursuant to ERISA §502(a), 29 U.S.C. §1102(a).

3.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' claims, in whole or in part, are subject to conflict preemption pursuant to ERISA §514(a), 29 U.S.C. §1144(a).

4.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' loss, in whole or in part, was caused by their own acts and omissions.

5.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' loss, in whole or in part, was caused by third parties' acts and omissions.

6.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' claims under the DTPA are barred, in whole or in part, as claims based upon the rendering of professional services. TEX. BUS. & COMM. CODE §17.49(c).

7.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' claims are barred, in whole or in part, by the applicable statute(s) of limitation.

8.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' claims for equitable relief are barred, in whole or in part, by their unclean hands.

9.      Answering further, if such be necessary, Defendant states affirmatively that Plaintiffs' claims, in whole or in part, are barred by ratification and waiver.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant Raymond Wicker prays that, upon final hearing, Plaintiffs take nothing by their suit, and that Defendant recover his costs,

---

together with such further and other relief, in law and equity, to which this Court finds him justly entitled.

## ORIGINAL COUNTERCLAIM AND THIRD PARTY PETITION

Subject to and without waiving his Original Answer, Defendant Raymond Wicker ("Wicker"), as counter- and third party plaintiff, files this, his Original Counterclaim and Third Party Petition and would respectfully show the Court as follows:

### PARTIES, VENUE AND JURISDICTION

1.      Defendant Wicker is an individual residing in Texas.

2.      Plaintiff Patricia Westfall Gonzales ("Gonzales") is an individual residing in Texas.  She has appeared in the case, and may be served by serving her attorney of record pursuant to the Texas Rules of Civil Procedure.

3.      Third Party Defendant G.E. O'Neill ("O'Neill") is an individual residing in Texas.  He may be served at his residence of 1670 Sheerbrooke, Houston, Texas 77056 or business address of 3835 Dacoma, Houston, Texas 77092.

4.      Venue is proper pursuant to Texas Civil Practices & Remedies Code §15.002 in Dallas County as it is the county in which all or a substantial part of the events or omissions giving rise to this suit occurred.

5.      Plaintiff Gonzales and Third Party Defendant O'Neill are individuals subject to personal jurisdiction of the Court.  The amount in controversy and the relief requested are within the subject matter jurisdiction of this Court.

### BACKGROUND

6.      Wicker is a licensed insurance agent in the State of Texas.  In 2001 O'Neill, the Executive Vice President for Westfall Constructors, Ltd. ("Westfall") and certified public

accountant was referred to Wicker to assist O'Neill in setting up a welfare benefit plan under the Internal Revenue Code (the "Code") for Westfall. Specifically he requested a welfare benefit plan be created pursuant to 26 U.S.C. §419A(f)(6). O'Neill had researched the issues surrounding such plans and, in his capacity as a certified public accountant and as an accountant for Westfall, desired to use a 419A(f)(6) plan to obtain substantial tax savings for Westfall and its owners. He was cognizant of the legal opinions issued concerning the legality of the Advantage DBO Plan (the "Plan") designed by the BISYS Group, Inc. ("BISYS"), through which Wicker sold the plan.

7.     In December 2001, Westfall adopted the Advantage DBO Plan, effective January 1, 2001. As the principals of Westfall and O'Neill were aware, the Advantage DBO Plan was funded solely with life insurance polices on the lives of the principals of Westfall. In fact, disclosures were signed on behalf of Westfall acknowledging life insurance was to be used as a funding vehicle and also that it was Westfall's responsibility to seek the advice of its own tax professional regarding the application of the tax laws to the transaction. The disclosures included an acknowledgement that legislation was pending in Congress that would restrict or eliminate the benefits under the plan with respect to the tax deductions O'Neill sought. Acknowledging the risk associated with taking such tax deductions, Westfall participated in a program presented by BISYS offering fiduciary audit insurance. offered

8.     O'Neill, Westfall's accountant, was not the only Westfall representative intimately involved in the transaction. Gonzales is also a licensed insurance agent in the State of Texas. She was involved in the procurement of the life insurance policies used to fund the Advantage DBO Plan. While Wicker is listed as the servicing producer on the life insurance policies, Gonzales is listed as a writing producer. The commissions for the policies, described as

"grossly excessive" by Plaintiffs' Original Petition, were split four ways, with Gonzales receiving the largest percentage.

9.      In 2003, the Internal Revenue Service ("IRS") issued regulations relating to Section 419(a)(f)(6) of the Code effectively precluding use of Section 419A(f)(6) in a manner that would allow any significant tax deductions funding a plan with cash value life insurance.  As a result, BISYS terminated the Advantage DBO Plan and sought to return the life insurance policies to its participants.

10.     In 2003, upon information and belief, several individuals, including Defendant Norm Bevins, John Cocks and Scott Ridge, began marketing a new welfare benefit plan created pursuant to Section 419(e) of the Code and named the "Millennium Plan."  Also upon information and belief, marketers of the Millennium Plan began actively soliciting former members of the Advantage DBO Plan.

11.     Apparently these marketers contacted Westfall.  O'Neill contacted Wicker seeking to convert Westfall's Advantage DBO Plan to the Millennium Plan for tax reasons.  At O'Neill's insistence, Wicker provided O'Neill with documents Wicker had compiled relating to the Advantage DBO Plan and assisted him in completing the paperwork to transfer Westfall's principal's insurance policies to the Millennium Plan.  Wicker received no compensation, commissions or otherwise, as a result of the transfer.  He simply did what he was instructed to do by O'Neill.

12.     In 2007, the IRS issued two notices and one revenue ruling warning taxpayers that it intended to deny all, or virtually all, claimed tax benefits for 419(e) plans funded with cash value life insurance.

## COUNT ONE – CONTRIBUTION AND INDEMNITY

13.     Plaintiffs' Original Petition asserts various causes of action, including fraud, negligent misrepresentation, fraudulent concealment, civil conspiracy, and violations of Texas Insurance Code Art. 541.151. The Petition also seeks the imposition of a constructive trust to hold funds received by one or more of the named defendants from Plaintiffs.

14.     Wicker, as counter and third-party plaintiff, is entitled to contribution and indemnity from counter defendant Gonzales and third-party defendant O'Neill toward any liability that may be found to exist from Wicker to Plaintiffs as a result of the occurrences made the basis of the Plaintiffs' suit. In this connection, Wicker will show that both Gonzales and O'Neill participated in the development of the Advantage DBO Plan. Specifically, Gonzales received a sizable commission (larger than that of Wicker) for her efforts procuring the life insurance to fund the plan. As Westfall's controller, O'Neill recommended the 419A(f)(6) to Westfall in an effort to reduce tax liability. Furthermore, he approached Wicker requesting assistance in transferring the life insurance polices to the Millennium Plan. Accordingly, pursuant to Chapter 33 of the Civil Practice and Remedies Code, Wicker is entitled to contribution for the percentage of responsibility assigned to Gonzales and O'Neill by the trier of fact.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant Raymond Wicker, as counter-plaintiff and third-party plaintiff, prays that third-party defendant Jerry O'Neill be cited to appear and answer, and upon final hearing, that he have the following:

1.     Judgment against Patricia Westfall Gonzales and Jerry O'Neill for contribution as provided by law.

2.    Costs of suit.

3.    Such further and other relief, in law and equity, to which this Court finds him

justly entitled.

Respectfully submitted,

KESSLER & COLLINS
A Professional Corporation

By: _____

GARY S. KESSLER
State Bar No. 11358200
BRYON L. ROMINE
State Bar No. 24049804

2100 Ross Ave., Suite 750
Dallas, Texas 75201
214.379.0722 Telephone
214.373.4714 Facsimile

*ATTORNEYS FOR RAYMOND WICKER*

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing has been served by Certified Mail, Return Receipt Requested on Anthony L. Vitullo, Fee, Smith, Sharp and Vitullo, LLP, Three Galleria Tower, 13155 Noel Road, Suite 1000, Dallas, Texas 75240 on this 9th day of June 2008.

_____
BRYON L. ROMINE

**DEFENDANT RAYMOND WICKER'S ORIGINAL ANSWER, COUNTERCLAIM AND THIRD PARTY PETITION – Page 7**

Master Plan Document.MMEWBP.04162007.001

# MASTER PLAN OF THE
# MILLENNIUM
# MULTIPLE EMPLOYER WELFARE BENEFIT PLAN

**Effective as Amended on the 1st day of January, 2005**
**Copyright 2002, Millennium Marketing Group, LLC**
**Patent Pending, 2002**

## EXHIBIT
## B

Master Plan Document.MMEWBP.04162007.002

# TABLE OF CONTENTS

**ARTICLE I:**      DEFINITIONS......................................................................1

| | | |
|---|---|---|
| 1.01 | Adoption Agreement | 1 |
| 1.02 | Beneficiary | 1 |
| 1.03 | Benefit | 1 |
| 1.04 | Code | 2 |
| 1.05 | Committee | 2 |
| 1.06 | Contribution | 2 |
| 1.07 | Covered Employer | 2 |
| 1.08 | Death Benefit | 2 |
| 1.09 | Effective Date | 2 |
| 1.10 | Eligible Employee | 2 |
| 1.11 | Employee | 2 |
| 1.12 | Employer | 2 |
| 1.13 | ERISA | 2 |
| 1.14 | Fiduciary | 2 |
| 1.15 | Insurance | 2 |
| 1.16 | Life Benefit | 3 |
| 1.17 | Participant | 3 |
| 1.18 | Participation Date | 3 |
| 1.19 | Plan | 3 |
| 1.20 | Plan Assets | 3 |
| 1.21 | Plan Year | 3 |
| 1.22 | Qualifying Employer | 3 |
| 1.23 | Rating Group | 3 |
| 1.24 | Reinsurer | 3 |
| 1.25 | Sponsor | 3 |
| 1.26 | Summary Plan Description | 4 |
| 1.27 | Third Party Administrator | 4 |
| 1.28 | Triggering Event | 4 |
| 1.29 | Trust Agreement | 4 |
| 1.30 | Trust | 4 |
| 1.31 | Trustee | 4 |
| 1.32 | Underwriter | 4 |

**ARTICLE II:**      ESTABLISHMENT OF TRUST POWERS OF THE TRUSTEE ...............................................................................4

| | | |
|---|---|---|
| 2.01 | Trust and Trustee | 4 |
| 2.02 | Trustee's Duty to Manage Plan Assets, Take in Contributions, and Make Distributions for Benefits and Plan Expenses | 5 |
| 2.03 | General Powers of Trustee/Fiduciary Duties | 5 |
| 2.04 | The Trustee's Accounting | 5 |

**Master Plan Document.MMEWBP.04162007.003**

2.05    Successor Trustee.................................................................................5

        a.      Removal/Resignation of a Trustee.............................................5
        b.      Power of the Successor Trustee/Limit of Liability.....................6

2.06    Bonding.................................................................................................6
2.07    Trustee's Fees and Expenses ..............................................................6

        a.      Compensation of the Trustee and Indemnification ....................6
        b.      Payment of the Trustee for Services ..........................................7

2.08    Insurance as Plan Assets .....................................................................7

ARTICLE III:        ADOPTION OF PLAN BY QUALIFYING EMPLOYERS AND
                    PARTICIPATION BY COVERED EMPLOYERS
                    .................................................................................................8

3.01    Adoption of Plan ..................................................................................8
3.02    Covered Employer Status .....................................................................8
3.03    Limitation on Covered Employers ........................................................8

        a.      Minimum Number of Covered Employers ...................................8
        b.      Maximum Contributions............................................................8
        c.      Family Members .......................................................................8
        d.      Adjustments To Conform With Limitations ................................8

3.04    Duration of Participation......................................................................9
3.05    Notices to Covered Employer or to the Third Party Administrator............10
3.06    Terms of Participation for Covered Employers ...................................10
        a.      Mandated Terms of the Adoption Agreement ..........................10
        b.      Compliance with Terms of the Adoption Agreement/Right to
                Financial Disclosures ...............................................................11
        c.      Obligation to Make Fixed Contributions ..................................12
        d.      Failure to Make Fixed Contributions or Other Default
                And Forfeiture..........................................................................12
        e.      Refund of Initial Contribution ..................................................12

3.07    Covered Employer Termination of Participation...................................13

ARTICLE IV:         PARTICIPATION BY ELIGIBLE EMPLOYEE ............................13

4.01    Eligibility Requirements .....................................................................13
4.02    Issuance of Insurance Policy and Rating Group Assignment........................13

        a.      Issuance of Insurance Policy and Rating Group Assignment............13
        b.      Notice of Rating Group Assignment.........................................14

Master Plan Document.MMEWBP.04162007.004

c.   Binding Nature of Rating Group Assignment ..................................14

4.03  Participation/Designation of Beneficiary ...........................................14

a.   Participation .................................................................................14
b.   Designation of Beneficiary .........................................................14
c.   Automatic Beneficiary in the Event of No Designation ..............15
d.   Assignment of Insurance ............................................................15

4.04  Termination of Plan Participation .......................................................15
4.05  Notices Pertaining To Triggers for Benefits ......................................16

ARTICLE V:    ADMINISTRATION OF THE PLAN AND PAYMENT OF
              BENEFITS .....................................................................16

5.01  Administration by Third Party Administrator ......................................16

a.   Plan Administration .....................................................................16
b.   Appointment of Third Party Administrator ................................16
c.   Service and Termination of Service ............................................16
d.   Appointment for Temporary Service as Trustee .........................17
e.   Duty to Wind Up Plan Affairs ....................................................17

5.02  Powers of Third Party Administrator ..................................................17

5.03  Payment of Fixed Benefits Under the Plan .........................................17

a.   Form of Fixed Benefit and Triggering Events ............................17
b.   Payment of Fixed Benefits – Triggering Events .........................17
c.   Forfeiture of Excess Proceeds to the Plan/No Reversion ...........18
d.   Forfeiture of Fixed Benefit Upon Default of the
     Covered Employer ......................................................................19
e.   Forfeiture of Fixed Benefit Because of Disqualifying Event ......19
f.   Forfeiture of Death Benefit Equal to the Aggregate of Life
     Benefits Utilized ........................................................................19
f.   No Anticipation or Alienation ....................................................19

5.04  Other Duties of Third Party Administrator .........................................19
5.05  Duties and Limitations .......................................................................19
5.06  Delegation of Duties/Retention of Experts and Professionals ............20
5.07  Fees and Expenses of the Third Party Administrator/Indemnification ..20

a.   Compensation and Indemnification .............................................20
b.   Payment of the Third Party Administrator for Services ..............20



Master Plan Document.MMEWBP.04162007.005

**ARTICLE VI:**    TERMINATION OF PARTICIPATION OF COVERED
EMPLOYER BY REASON OTHER THAN DEFAULT OF
ADOPTION AGREEMENT OR WITHDRAWAL OF THE
COVERED EMPLOYER ...............................................................21

6.01    Termination of Participation of Covered Employer ..........................21
6.02    Manner of Termination of Participation ..........................................21

    a.    Notice of Termination..........................................................21
    b.    Winding Up the Covered Employer's Affairs ......................22
    c.    Roll-Over of Fixed Benefit Amounts .................................22

**ARTICLE VII:**    RECORDKEEPING AND DISCLOSURE REQUIREMENTS
........................................................................................22

7.01    Maintenance of Records .................................................................22
7.02    Delegation of Record Retention Responsibilities .............................23
7.03    Annual Report/Forms Required by Law...........................................23
7.04    Mandatory Disclosures ..................................................................24
7.05    Inspection of Books and Records ...................................................24

**ARTICLE VIII:**    AMENDMENT AND TERMINATION OF THE PLAN AND
MISCELLANEOUS ADMINSTRATIVE MATTERS
........................................................................................25

8.01    Plan Amendment............................................................................25
8.02    Plan Termination............................................................................25

    a.    Notice of Plan Termination.................................................25
    b.    Duties of Third Party Administrator and Trustee and Final
Disclosures........................................................................25
    c.    Rights of Participants.........................................................25
    d.    Excess Plan Assets ...........................................................26
    e.    Finality of Termination ......................................................26

8.03    Fiduciary Appointments..................................................................26
8.04    No Employment Contract ...............................................................26
8.05    Benefits ........................................................................................26
8.06    No Guarantees/Resolutions of Disputes ..........................................26

    a.    No Guarantee ...................................................................26
    b.    Disputes...........................................................................27
    c.    Determination/Resolution of Disputes.................................27

8.07    Withholding of Taxes and Legal Defense Fund ................................27
8.08    Duty to Investigate.........................................................................27

Master Plan Document.MMEWBP.04162007.006

8.09 Third-Party Rights ........................................................................ 27
8.10 Status and Adequacy of the Trust Fund ........................................ 28

    a. One Fund and One Plan ........................................................ 28
    b. Status of Insurance Policies .................................................. 28
    c. Benefits From Plan .............................................................. 28

8.11 Receipt and Release for Payments ................................................. 28
8.12 Direct Transfers ............................................................................ 28
8.13 The Plan ....................................................................................... 28
8.14 Reinsurance .................................................................................. 29
8.15 Agent for Service of Process ........................................................ 29
8.16 Severability .................................................................................. 29
8.17 Applicable Law ............................................................................ 29
8.18 Construction ................................................................................. 29

EXHIBIT A:     Adoption Agreement ........................................................... A

EXHIBIT B:     Rating Group Identifications with Fixed Contribution and
                 Schedule of Fixed Benefit Amounts ................................... B

EXHIBIT C:     Insurance Products Offered Under the Plan .......................... C

Master Plan Document.MMEWBP.04162007.007

# MASTER PLAN OF THE
# MILLENNIUM
# MULTIPLE EMPLOYER WELFARE BENEFIT PLAN

This Millennium Multiple Employer Welfare Benefit Plan (the "Plan"), adopted as amended effective January 1, 2005, is a 10 or more employer plan within the meaning of Section 419A(f)(6) of the Internal Revenue Code of 1986, as amended (the "Code"). This Plan is established and sponsored for the purpose of providing death and other qualifying welfare benefits to Eligible Employees of Covered Employers under the terms and conditions stated herein.

This Plan is a 10 or more employer welfare benefit plan as defined by the Code and the Employee Retirement Income Security Act of 1974, as amended.[1] This Plan is intended to constitute a fully insured welfare benefit arrangement. The benefits provided by this Plan are funded solely through contributions of Covered Employers, and are held in trust for the exclusive benefit of Participant/Eligible Employees and their designated Beneficiaries. All assets held in trust under this Plan will be used to satisfy the Plan's obligations to pay benefits, and to cover the reasonable and necessary costs of administering the Plan and assuring the Plan's compliance with applicable state and federal laws.

This Plan supercedes any prior plan or arrangement under Code § 419A(f)(6) as to those Covered Employers who participate herein, and their Participant/Employees and designated Beneficiaries. Where the provisions of this Plan conflict with the terms of any Summary Plan Description issued under this Plan, or any Trust Agreement entered into pursuant to this Plan, the provisions of this Plan will control.

## ARTICLE I

## DEFINITIONS

1.01    **"Adoption Agreement"**    means the written agreement entered into by a Qualifying Employer under this Plan under which such Qualifying Employer adopts the Plan and agrees to abide by the Plan's provisions.

1.02    **"Beneficiary"**    means the person(s) identified by a Participant in a written "Designation of Beneficiary Form" as specified in Section 4.03.b of the Plan to receive Benefits and the automatic Beneficiary under Section 4.03.c.

1.03    **"Benefit"**    means any monetary amount or insurance policy paid from the Trust as provided by the Plan to a Participant in the Plan or a designated Beneficiary.

---

[1] 29 U.S.C. § 1002(40); 29 U.S.C. § 1144(b)(6)(A).

Final Master Plan-03                     I
January 2005

Master Plan Document.MMEWBP.04162007.008

1.04   "Code"      means the Internal Revenue Code of 1986, as amended, as clarified and construed under Treasury Regulations and controlling federal case law.

1.05   "Committee"      means the Plan Committee, comprised of five (5) to fifteen (15) individuals as appointed by the Plan Committee from time to time in accordance with the written procedures determined by the Plan Committee, who shall interpret the terms of the Plan in their sole and absolute discretion and shall undertake other functions as set forth herein.

1.06   "Contribution"      means the amount paid by a Covered Employer to the Trust created as required by the Plan and as specified in the Adoption Agreement.

1.07   "Covered Employer"      means a Qualified Employer who has entered into an Adoption Agreement and satisfied all the requirements of the Plan as to Covered Employer status.

1.08   "Death Benefit"      means any Benefit due to be paid from the Plan to a Beneficiary upon the death of a Participant, net of any Life Benefit paid prior to the Participant's death.

1.09   "Effective Date"      means the initial effective date for the Plan: November 1, 2002.

1.10   "Eligible Employee"      means an Employee of a Covered Employer who has satisfied the eligibility criteria established in the Adoption Agreement.

1.11   "Employee"      means any individual lawfully employed to work in the United States by a Covered Employer who is an "employee" under federal common law, and to whom the Covered Employer pays wages or makes guaranteed payments.

1.12   "Employer" means any entity or individual that lawfully employs individuals to work in the United States and who pays them wages or guaranteed payments subject to withholdings for federal and state employment taxes.

1.13   "ERISA"      means the Employee Retirement Income Security Act of 1974, as amended and as clarified and construed by Department of Labor Regulations and controlling federal case law.

1.14   "Fiduciary" means a person who has discretionary powers and authorities with regard to the establishment, maintenance and administration of this Plan and includes the Sponsor, the Committee, and the Trustee and the Third Party Administrator.

1.15   "Insurance" means any policy of insurance issued by any legal reserve life insurance company under which that Underwriter is obligated to pay monies to

Master Plan Document.MMEWBP.04162007.009

the Trust upon the occasion of the death of a Plan Participant or other triggering event under the Plan. Only "Insurance" issued by a carrier license to do business in the state of the insured and carrying an A+ rating or better as commercially reported by a major evaluator of insurance companies will be permitted to fund Benefits under this Plan. Further, "Insurance" shall be limited to those insurance products described in Exhibit "C," to this Plan.

1.16  **"Life Benefit"**    means the fixed Benefit or Insurance on a Participant paid by the Plan, or transferred to another trust from the Plan, in lieu of the Death Benefit upon the occurrence of certain triggering events during the Participant's lifetime. "Life Benefit(s)" are described in Exhibit "B" to the Plan and in each Participant's Certificate of Participation.

1.17  **"Participant"**    means an Eligible Employee identified in the Adoption Agreement of a Covered Employer for whom a policy of Insurance has been issued and is in full force and effect, and who has satisfied all other Plan requirements as to Participant status.

1.18  **"Participation Date"**    with regard to a particular Participant, means the first effective date of a policy of Insurance issued on the life of the Participant, or the first date of Participation under the terms of the Plan, if later.

1.19  **"Plan"**    means this Master Plan of the Millennium Multiple Employer Welfare Benefit Plan.

1.20  **"Plan Assets"**    means all Insurance, monies, real or personal property held in the Trust and any earnings, income, gain or loss, and appreciation or depreciation attributable thereto.

1.21  **"Plan Year"**    means the period from the Effective Date to December 31, 2002 and, thereafter, the period from January 1st to December 31st each calendar year.

1.22  **"Qualifying Employer"**    means an Employer who is a "C"-corporation, an "S"-corporation, a limited liability company, a limited liability partnership, a professional corporation or partnership recognized by state law.

1.23  **"Rating Group"**    means the class of similarly situated Participants for whom Covered Employers pay Contributions to the Trust as specified by this Plan.

1.24  **"Reinsurer"**    means any lawfully established and maintained insurance company that issues a policy of insurance to the Trust for the purpose of insuring the Trust against the risk of excess or unanticipated monetary loss or substandard performance of Plan Assets.

1.25  **"Sponsor"**    means the Plan Sponsor, Millennium Marketing Group, LLC.

1.26 "Summary Plan Description" means the plain-language written summary of the plan document that conforms to the requirements stated in ERISA Regulation § 2520.102-3, as amended by 63 Fed. Reg. 48376, or other amending final regulation.

1.27 "Third Party Administrator" means any individual or entity appointed by the Sponsor under an administrative services agreement whose primary responsibility is to administer claims of Participants and Beneficiaries, assure that disclosures and other required communications are accomplished, and conduct other business transactions required for this Plan to achieve its stated purposes.

1.28 "Triggering Event" means an event that triggers the payment of a Death Benefit or a Life Benefit under the Plan as described in Section 5.03.b., herein.

1.29 "Trust Agreement" means the written agreement between the Plan and the Trustee that establishes the Trust under this Plan, regardless of the date of execution of such agreement

1.30 "Trust" means the Plan Assets held in accordance with the Trust Agreement.

1.31 "Trustee" means the individual or entity that entered into the Trust Agreement with the Plan, or any successor thereto, including a temporary Trustee appointed by the Third Party Administrator.

1.32 "Underwriter" means the issuer or issuers of Insurance selected by the Covered Employer in the Adoption Agreement.

## ARTICLE II

### ESTABLISHMENT OF TRUST
### POWERS OF THE TRUSTEE

2.01 **Trust and Trustee.**

All Plan Assets shall be held by the Trustee in Trust and administered by the Trustee at the direction of the Committee and in accordance with this Plan and the Trust Agreement. The initial Trustee, and any successor Trustee, shall be appointed by the Sponsor, with the approval of the Committee on behalf of the Plan, and shall be a federally insured bank, a licensed investment company, or a bonded and licensed trust company. Any temporary Trustee shall be appointed by the Committee and shall serve as Trustee until the Sponsor appoints a successor Trustee with the approval of the Committee.

**2.02    Trustee's Duty to Manage Plan Assets, Take in Contributions, and Make Distributions for Benefits and Plan Expenses.**

It shall be the duty of the Trustee to take Contributions and other payments into the Trust and to make payments out of the Trust to such persons or entities, in such a manner, at such times and in such amounts as may be specified (i) in written or oral (and later ratified, in writing) directions from the Third-Party Administrator or Committee received from time to time by the Trustee, or (ii) as may be expressly provided by the terms of this Plan. The specific rights and obligations of the Trustee shall be set forth in the Trust Agreement which is incorporated herein by reference and made a part of this Plan.

**2.03    General Powers of Trustee/Fiduciary Duties.**

Subject to any limitations expressly set forth herein, and upon direction by the Third Party Administrator or Committee, the Trustee shall have the powers set forth in the Trust Agreement. In acting on behalf of the Plan, the Trustee shall act with regard to the Plan. as a reasonably prudent fiduciary with expertise and experience dealing with plan assets and plan transactions of the nature and kind set forth in this Plan.

**2.04    The Trustee's Accounting.**

The Trustee shall keep accurate and detailed accounts of all investments, receipts and disbursements and other financial transactions hereunder, and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times by any authorized governmental agency, the Third Party Administrator, and any person or persons designated by a Covered Employer. Within six (6) months following the last day of each Plan Year, and within sixty (60) days after the removal or resignation of the Trustee, the Trustee shall file with the Third-Party Administrator and each Covered Employer, a written report setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during the period ending as of such period, including a description of all investments purchased and sold with the cost and net proceeds of such purchases or sales (accrued interest paid or received being shown separately), and showing all cash securities and other property held at the end of such period. If no written objection is filed by the Third-Party Administrator or any Covered Employer with respect to such report within ninety (90) days after its delivery by the Trustee, then the report shall be deemed to be accepted and shall be final and binding. In the absence of error, or other issue raised by an independent auditor pursuant to the annual audit of the Plan, neither a Covered Employer nor any other person shall have the right to demand or be entitled to any further or different accounting by the Trustee.

**2.05    Successor Trustee.**

   **a.    Removal/Resignation of a Trustee.** The Committee may direct the Sponsor to remove the Trustee at any time, with or without cause, upon thirty (30) days notice in writing to the Trustee. The Trustee may resign at any time upon thirty (30) days notice in writing to the Third-Party Administrator. The Trustee's

resignation or removal shall be effective upon the expiration of such thirty (30) day period, regardless of whether a successor Trustee is appointed. In no event shall the Trustee be liable to any Covered Employer, Participant, or Beneficiary for merely exercising its right to resign as Trustee or for merely being removed by the Sponsor. Upon receipt of the resignation of the Trustee, or upon the removal of the Trustee, the Sponsor, with the approval of the Committee shall appoint and designate a successor Trustee or Trustees, and the Trustee shall assign and transfer and pay over to such successor Trustee the funds and properties then constituting the Trust. If for any reason a successor Trustee is not appointed, within the thirty (30) day notice period provided herein, then the Plan Committee shall direct the Sponsor to appoint a temporary Trustee to serve until such time as the Sponsor appoints a successor Trustee.

b.     **Power of the Successor Trustee/Limit of Liability.** Each successor Trustee shall have the same rights, titles, powers, duties, discretion and immunities and otherwise be in the same position as if originally named Trustee as set forth in this Plan and the Trust Agreement. No successor Trustee shall be liable for any act or failure to act of a predecessor Trustee. With the written approval of the Sponsor and Third Party Administrator, any successor Trustee may accept, in writing, the final accounting and written report of any predecessor Trustee, and such acceptance shall constitute the Plan's full release of liability of the predecessor Trustee for any act or omission with regard to the management of the Plan Assets, the acceptance of contributions, and the payment of Benefits and Plan expenses as set forth in the Trust Agreement and the Plan.

## 2.06   Bonding.

To the extent required by federal law, the Trustee shall execute a bond to secure the full and faithful performance by it of its duties and obligations as Trustee, and shall also bond, or shall cause to be bonded, any other person it authorizes to handle the Plan Assets or to whom any or all of the Trustee's duties, obligations and responsibilities may be delegated. Such bonds shall at all time conform to any and all applicable requirements of state and federal law and shall be in such amounts as the Trustee shall deem appropriate under the circumstances.

## 2.07   Trustee's Fees and Expenses.

a.     **Compensation of the Trustee and Indemnification.** Subject to the Plan Committee's approval, the Sponsor and the Trustee (from time to time) shall agree upon a schedule of fees to compensate the Trustee for its services performed under the Plan and Trust Agreement. The Trustee shall be entitled to:

i.     be paid reasonable compensation for all services rendered by it (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

Master Plan Document.MMEWBP.04162007.013

ii.    be paid reimbursement, upon request, for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Plan (including the reasonable compensation and the expenses and disbursements of its counsel and its agents), except any such expense, disbursement or advance as may be attributable to its gross negligence, violation of ERISA or breach of trust; and

iii.    be held harmless from and against any loss, liability or expense incurred without gross negligence, breach of fiduciary duty, violation of ERISA or breach of trust on its part, arising out of or in connection with the acceptance or administration of this Trust or its duties under the Plan and Trust Agreement, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties.

**b.    Payment of the Trustee for Services.**  The Trustee shall be paid from funds held in the Sponsor's business account at the direction of the Third Party Administrator or Plan Committee upon thirty (30) days of the Third Party Administrator's receipt of an invoice from the Trustee or as otherwise set forth in the Trust Agreement.  If any payment properly due the Trustee for its reasonable fees, costs, expenses and fees of attorneys, certified public accountants, recognized authorities in their field and agents (not employees of the Trustee) incurred in performance of its duties is not paid at the direction of the Third Party Administrator, the Trustee shall have a lien against the Trust for the amount of all fees, costs, charges, and amounts that may be rightfully due it.  The lien granted the Trustee hereunder shall have priority over the claims of any Participant or Beneficiary against the Trust.

**2.08    Insurance as Plan Assets.**

The Trustee may hold in Trust Insurance on the lives of Participants as identified in Exhibit "C," according to the terms of the Rating Group description shown in Exhibit "B."  Insurance shall be deemed Plan Assets and any contributions or premiums paid to Underwriters for such Insurance, and any proceeds derived from such Insurance shall also be deemed Plan Assets.  Copies of Insurance policies shall be delivered to the Third Party Administrator by the Trustee.  In no event shall the use of Insurance to fund Benefits under this Plan be deemed a breach of fiduciary duty on the part of the Trustee.

## ARTICLE III
## ADOPTION OF PLAN BY QUALIFYING EMPLOYERS AND PARTICIPATION BY COVERED EMPLOYERS

### 3.01   Adoption of Plan.

A Qualifying Employer may adopt the Plan by executing and delivering to the Third Party Administrator an Adoption Agreement in substantially the form shown as Exhibit "A," hereto, by paying the initial Contributions and any administration fees required by the Adoption Agreement, and by satisfying the requirements of Covered Employer status as stated, below.  The Adoption Agreement shall, among other things, identify those Eligible Employees of the Qualifying Employer that shall be given the opportunity to become Participants in the Plan.

### 3.02   Covered Employer Status.

A Qualifying Employer shall become a Covered Employer for purposes of this Plan upon the last to occur of the following events:

i.   the Third Party Administrator receives an executed Adoption Agreement;

ii.   a resolution or consent of the Board of Directors or other governing body of the Qualifying Employer authorizes the execution and delivery of the Adoption Agreement as set forth, above, or ratifies such execution and delivery, and a copy of such resolution or consent is received by the Third Party Administrator;

iii.   the initial Contributions or other initial payments identified in the Adoption Agreement are placed into the Plan Escrow Account to be forwarded to the Trustee upon issuance of Insurance as set forth in the Adoption Agreement;

iv.   Insurance identified by the Adoption Agreement on the lives of those Eligible Employees the Qualifying Employer intends to be Participants in the Plan are issued to the Trust and received by the Trustee.

### 3.03   Limitation on Covered Employers.

a.   **Minimum Number of Covered Employers.**  In no event shall less than ten (10) Covered Employers participate in this Plan and make contributions as required under the terms of their respective Adoption Agreements.  In the event that the number of Covered Employers participating in this Plan ever fall below ten (10) for one (1) full Plan Year, then this Plan shall immediately terminate and

all Plan Assets shall be distributed and the affairs of the Plan settled as set forth in Article VIII, below.

b.   **Maximum Contributions.** The Plan Committee shall endeavor to assure that Contributions of a single Covered Employer do not:

i.   in the aggregate, exceed ten percent (10%) of the Plan Assets;

ii.   in the aggregate, exceed ten percent (10%) of all aggregate Contributions made to the Plan by all Covered Employers; or

iii.   in the aggregate, exceed ten percent (10%) of the Contributions made to any single Rating Group.

c.   **Family Members.** For purposes of determining whether the maximum contribution limitations under Section 3.03.b are met, any Contributions by any Covered Employer shall be deemed to include amounts contributed for any family member of the Covered Employer's Participant made by any other Covered Employer participating in the Plan under a separate Adoption Agreement. Information pertaining to family members shall be disclosed by the Covered Employer in the Adoption Agreement.

d.   **Adjustments to Conform with Limitations.**   In the event the Contributions of any Covered Employer exceed the maximum Contribution limitations set forth, above, the Third Party Administrator, at the direction of the Committee, shall make such adjustments to Insurance, Rating Groups, premiums, terms of Adoption Agreements or Contribution amounts that are necessary to bring the Covered Employer's Contribution within such limitations, and shall direct the Trustee to make adjustments to Insurance or other Plan Assets to affect the changes required by the Third Party Administrator. The affected Covered Employer must comply with the Third Party Administrator's requests for adjustments under this section, or it will be deemed to be in default of the Adoption Agreement and its participation in the Plan will be terminated as set forth in Section 3.06.d, below.

**3.04   Duration of Participation.**

Once the last of the events described in Section 3.02 have occurred, a Covered Employer will remain such, and will continue participating in the Plan until one or more of the following events first occurs:

i.   the Covered Employer ceases to make Contributions as identified in the Adoption Agreement or is otherwise deemed by the Third Party Administrator (with the approval of the Committee) to be in default of the Adoption Agreement as specified in Section 3.06.d, below;

ii. thirty (30) days have expired since the Third Party Administrator sent written notice to the Covered Employer in a manner specified by Section 3.05, below, that the Covered Employer's participation is to be terminated for any reason for which the Third Party Administrator is authorized to provide such notice of termination to a Covered Employer under this Plan in non-default situations;

iii. the Plan is terminated pursuant to Article VIII;

iv. thirty (30) days have expired since the Covered Employer provided the Third Party Administrator with written notice in a manner specified by Section 3.05, below, that the Covered Employer wishes to withdraw from the Plan as set forth in Section 3.07, below, and the Third Party Administrator received such notice;

v. the last of all insurance issued on the lives of Eligible Employee/Participants of the Covered Employer lapse, are cancelled or are terminated by the insurance company issuing such policies; or

vi. the last of any fixed Death Benefits or Life Benefits due and owing under the terms of this Plan and the Adoption Agreement are paid to Eligible Employee/Participants of the Covered Employer or their designated Beneficiaries.

**3.05 Notices to Covered Employer or to the Third Party Administrator.**

Written notices by and between any Covered Employer and the Third Party Administrator shall be addressed as identified in the Adoption Agreement and shall be sent by certified mail, return receipt requested, or by next day delivery, return receipt requested by any commercial carrier.

**3.06 Terms of Participation for Covered Employers.**

a. **Mandated Terms of the Adoption Agreement.** Adoption Agreements under the Plan will contain, at a minimum, the following provisions:

i. a statement of the conditions for eligibility for Employees of the Covered Employer to become Participants in the Plan;

ii. a statement that, upon the issuance of the first insurance on the life of an Eligible Employee/Participant of the Covered Employer, the Participant shall be assigned to a Rating Group by the Third Party Administrator, based upon risks commonly recognized and actuarially taken into account by providers of death benefits or cash surrender value benefits in the insurance industry;

Master Plan Document.MMEWBP.04162007.017

iii.    a statement that the Covered Employer's fixed Contribution amount will be based upon an aggregate of all fixed Contribution amounts associated with all the Rating Groups to which the Covered Employer's Participants are assigned;

iv.    a statement that the Benefits received by each Participant (or a designated Beneficiary of the Participant) of the Covered Employer shall be a guaranteed fixed amount determined by the Rating Group to which each Participant of all Covered Employers in the Plan is assigned and the length of time of participation;

v.    a statement that, as to Plan Assets, the risk of gains or losses shall be borne by all Participants in the Plan within an assigned Rating Group, regardless of the Covered Employer employing them;

vi.    a statement that, in no event, shall all or part of any Plan Assets or other sums held in Trust be paid to, accounted to or credited or deducted from an account of any particular Covered Employer participating in the Plan or any Eligible Employee/Participants of such Covered Employer;

vii.    a statement that, in the event a Covered Employer decides to withdraw from the Plan and gives proper notice of such withdrawal, the Plan will pay only the fixed amount of Life Benefit attributable to the Rating Group assignment of each Participant of the Covered Employer as shown by Exhibit "B" to this Plan. Any excess amounts shall be forfeited to the Plan and shall be used to defray the normal costs of Plan administration for the benefit of all Participants and Beneficiaries of all Covered Employers participating in the Plan;

viii.    a description of the Insurance and Underwriters selected by the Covered Employer to insure the lives of the Covered Employer's Participants;

ix.    a statement obligating the Covered Employer to provide to the Third Party Administrator, and maintain, current contact information (i.e. address and telephone number) of all Eligible Employee/Participants of the Covered Employer; and

x.    a statement that the Covered Employer will forfeit all Insurance and Contributions to the Plan in the event of default of the terms of the Adoption Agreement.

b.    **Compliance with Terms of the Adoption Agreement/Right to Financial Disclosures.** During the term of participation in the Plan, Covered Employers shall comply with the terms of the Adoption Agreement, including but not limited to those terms specifying the amount, timing, and manner of payment

of Contributions. The Third Party Administrator, with the approval of the Committee, has sole and absolute discretion to determine whether a Covered Employer is meeting its obligations under the Adoption Agreement, and to take such action as is authorized by the Plan's terms in the event of a Covered Employer's default of the Adoption Agreement. So long as a Covered Employer has not received notice from the Third Party Administrator that the Covered Employer is in default of the terms of the Adoption Agreement, the Covered Employer shall be entitled (upon reasonable notice) to review and receive copies of the financial records and other disclosures of the Plan identified in Article VII. Reviews by the Covered Employer shall be conducted during normal business hours at the office of the Third Party Administrator.

c.    **Obligation to Make Fixed Contributions.** Covered Employers shall make Contributions to the Plan in an amount specified in the Adoption Agreement, including Plan administration expenses identified therein. Contribution amounts shall be the aggregate of all the fixed amounts identified in Exhibit "B" attributable to the particular Rating Groups to which the Participants of the Covered Employer are assigned. Contribution amounts shall not be increased, nor decreased, except as increased or decreased for every Participant for every Covered Employer in a particular Rating Group as determined to be necessary by the Committee to maintain all the Insurance held in the Trust for that Rating Group.

d.    **Failure to Make Fixed Contributions or Other Default and Forfeiture.** In the event a Covered Employer fails to make any Contribution required by the Adoption Agreement or otherwise becomes in default of the Adoption Agreement's terms for a period of thirty (30) days after which such Contribution became due or such default occurred, then the Third Party Administrator shall provide written notice to the Covered Employer of the Covered Employer's termination from Plan participation by default. Upon notice of termination from the Plan to the Covered Employer, all Insurance on the lives of the Covered Employer's Participants shall be terminated by the Trustee. Any cash value of such Insurance shall become a Plan Asset available for use by the Trustee, at the direction of the Committee, for the Benefit of all Plan Participants and Beneficiaries to defray the cost of Plan administration, and may be placed in a reserve account, a legal expense account, or applied in some other manner to uniformly benefit all Participants of the Plan.

e.    **Refund of Initial Contribution.** If, for any reason, no policy of Insurance is issued by an Underwriter on any Eligible Employee of a Covered Employer, or no Rating Group assignment is made on any Eligible Employee of the Covered Employer, then any Contribution made by such Covered Employer to the Plan and/or Trustee shall be refunded to the Covered Employer, minus the administration fee identified in the Adoption Agreement, which shall be used to offset the Plan's reasonable administration expenses associated with initiating the Covered Employer's participation.